IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| EMILIO M. LLANES and | ) | 4:06CV3155 |
| FRANCES M. LLANES, | ) | |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM** |
| v. | ) | **AND ORDER** |
| | ) | |
| VERNON BARTON, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiffs, Emilio and Frances Llanes, husband and wife, allege that on July 4, 2004, the defendant, Vernon Barton, a Nebraska State Patrol Trooper, stopped their vehicle without probable cause, informed Mr. Llanes that he was under arrest for speeding, attempted to forcibly remove Mr. Llanes from the vehicle, conducted a pat-down search of Mr. Llanes' person, and ordered Mr. Llanes into the patrol car before finally issuing a warning ticket and allowing them to proceed. The plaintiffs, who both are United States citizens of Mexican descent, theorize that the traffic stop was the result of racial profiling. Trooper Barton has moved for summary judgment based on qualified immunity (filing 44).[1]

---

[1] Qualified immunity protects governmental officials from liability for civil damages when they are performing discretionary functions and their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Brockinton v. City of Sherwood*, 503 F.3d 667, 671 (8th Cir. 2007) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))  "[T]o withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated the plaintiff's clearly established right." *Id.* (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir.1996)).

Preliminary to my discussion of the qualified immunity issue, I note that Mr. Llanes filed a motion to compel discovery on July 27, 2007 (filing 60), which included a request that the plaintiffs not be required to respond to the summary judgment motion until outstanding discovery has been completed.[2]  Although the plaintiffs have since responded to the summary judgment motion by filing a brief, I will consider Mr. Llanes' request for a continuance pursuant to Federal Rule of Civil Procedure 56(f).  That rule provides: "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."  Fed. R. Civ. P. 56(f).

The motion to compel is accompanied by an affidavit from Mr. Llanes (filing 61), but the affidavit merely establishes that Trooper Barton made no response to interrogatories and document requests that were served on him on May 5, 2007 (filings 37, 38).  It is apparent from the motion to compel, however, that Mr. Llanes is complaining that the summary judgment motion is supported by the affidavits of three Nebraska State Patrol officials who describe the contents of a videotape of the traffic stop and indicate that a NSP internal affairs investigation exonerated Trooper Barton (filing 47, exhibits 1, 2, 3).[3]  Because this evidence merely corroborates Trooper Barton's own affidavit concerning his actions and the actions of Mr. Llanes on July 4, 2004 (filing 47, exhibit 4), there is no basis for granting any relief under

---

[2] Because only Mr. Llanes' signature appears on the motion to compel, it is not treated as also filed on behalf of his wife.  *See* Memorandum and Order entered on June 1, 2007 (filing 40), warning Mr. Llanes not to file documents for his wife and instructing Ms. Llanes that she must sign the documents.

[3] According to one of the affidavits, the videotape was erased pursuant to NSP policy after 150 days.  The affidavit also states that internal affairs investigation files are routinely purged after one year.

Rule 56(f). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial.[4] *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

With respect to the motion to compel, the court entered a stay of discovery on June 20, 2007 (filing 53), in response to a motion that was filed by Trooper Barton on June 6, 2007 (filing 42), the same date that he filed the summary judgment motion. The stay motion was filed before Trooper Barton was required to respond to the interrogatories and requests for production of documents. *See* Fed. R. Civ. P. 6(c), 33(b)(3), and 34(b). Mr. Llanes has not shown that the court erred in entering the stay, which by its terms will remain in effect until 30 days after disposition of the summary judgment motion. Consequently, the motion to compel will be denied.

Returning to the summary judgment motion, I find many similarities between the present case and *Johnson v. Crooks*, 326 F.3d 995 (8th Cir. 2003), in which an African-American driver brought a § 1983 action against a police officer, alleging that the officer stopped her vehicle not for a traffic violation, but because of her race, in violation of Fourth and Fourteenth Amendments and state law. The basic facts of the case were these:

> On April 18, 2000, Linda Johnson was driving through rural Nebraska to Fort Riley, Kansas, where she lived with her husband, Army Sergeant Reginald Johnson. As she passed through the town of Beatrice at about 9:15 a.m., deputy sheriff Crooks pulled out from a parking lot and maneuvered his patrol car through traffic until it was directly behind Ms. Johnson's vehicle. After following closely for

---

[4] Although Trooper Barton argues that "Plaintiffs appear to have no witnesses, documentation or other evidence in support of their accusations" (filing 48, at 6), they have filed their own affidavits (filing 58, exhibits 1, 2) which refute Officer Barton's affidavit. The plaintiffs' affidavits were filed as "pretrial disclosures" on July 27, 2007, but will be considered in connection with the summary judgment motion.

approximately eleven miles, during which Ms. Johnson avers she was careful not to commit any traffic violations, Crooks signaled her to stop and approached her car.  Ms. Johnson asked why he pulled her over. Crooks responded, "because you were going left of center." Ms. Johnson denied crossing the center line and said that Crooks had targeted her because of her race and the type of car she was driving, a 1996 Lexus. Crooks told Ms. Johnson that race had nothing to do with the traffic stop.  Rather, he was concerned about her safety.  After returning to his patrol car and verifying Ms. Johnson's identity and license validity, Crooks issued her a written traffic warning. Before departing, Ms. Johnson again accused him of stopping her because of her race, which Crooks again denied.

When Crooks asked her for identification, Ms. Johnson gave him her military identification card because she could not quickly find her driver's license.  The card listed Ms. Johnson as a dependent civilian whose "sponsor" was Reginald Johnson.  The following day, Crooks called Fort Riley to report the circumstances of the traffic stop "to the proper military supervisory personnel."  Crooks was told there was no one in the military at Fort Riley named Linda Johnson.  He was referred to the Judge Advocate General's Office, where he spoke, perhaps coincidentally, to Reginald Johnson.  Mr. Johnson explained that Ms. Johnson was his wife and a military dependent, not a member of the military.  When Crooks complained that Ms. Johnson had accused him of being a racist, Mr. Johnson stated that he believed Ms. Johnson's version of the traffic stop.  Crooks asked to speak to Mr. Johnson's commanding officer about Ms. Johnson's warning citation. Mr. Johnson told Crooks how to contact his supervisor, the Deputy Inspector General, but Crooks did not do so.

*Id.*, at 996-97.

The district court in *Johnson* denied the police officer's motion for summary judgment based on qualified immunity on the federal claims, finding that there were disputed factual issues as to whether the plaintiff's vehicle had crossed the center line

4

and whether the traffic stop was the product of racial discrimination. The officer filed an interlocutory appeal, and the Eighth Circuit reversed.

On the Fourth Amendment claim, the Eighth Circuit found that even though there was factual dispute as to whether the plaintiff had committed a traffic violation, the officer's actions were objectively reasonable. It stated:

> The amended complaint alleges that Crooks violated the Fourth and Fourteenth Amendments by stopping and detaining Ms. Johnson for an alleged traffic violation. It is well-settled that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In determining the reasonableness of an automobile search or seizure, the Supreme Court recognizes that automobiles are inherently mobile, motorists have a lessened expectation of privacy when traveling on the public highways, and "[a]utomobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls." *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *see Cardwell v. Lewis*, 417 U.S. 583, 589-91, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

> As the district court recognized, "any traffic violation, even a minor one, gives an officer probable cause to stop the violator. [In such a case,] the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *Conrod v. Davis*, 120 F.3d 92, 96 (8th Cir. 1997) (quotation omitted), *cert. denied*, 523 U.S. 1081, 118 S.Ct. 1531, 140 L.Ed.2d 681 (1998); *see Whren*, 517 U.S. at 811-13, 116 S.Ct. 1769. However, the court denied summary judgment on the Fourth Amendment claim because Linda Johnson has averred that she did not cross the center line prior to the stop, creating a disputed factual issue that cannot be resolved at this stage of the proceedings as to whether

5

Crooks had probable cause to make the stop. The issue on appeal, then, is whether the dispute over whether Ms. Johnson in fact crossed the center line is material for purposes of Crooks's qualified immunity defense to the Johnsons' § 1983 claim for damages.

On appeal, Crooks virtually concedes, and we accept, the district court's determination that Ms. Johnson's affidavit asserting she did not commit a traffic violation creates a genuine fact dispute concerning whether Crooks had probable cause to stop and detain her for that reason. But the district court's analysis overlooked the investigatory aspect of traffic stops in general and of this stop in particular. Because a brief traffic stop is a relatively minor intrusion on the motorist's privacy interests, its Fourth Amendment reasonableness is judged by the standard that applies to investigatory stops–whether "the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quotation omitted); *see United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001). An officer with reasonable suspicion may stop the automobile and may question the driver "to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

Even routine traffic violations may require some investigation into the motorist's conduct or condition, followed by the exercise of judgment in deciding how to enforce the traffic laws in that situation. For example, an officer who initially stops a car for running a red light may then accept the motorist's explanation that the light was yellow when she entered the intersection and let the driver depart with an oral or written warning. At that point, the investigatory stop is complete. *See United States v. White*, 81 F.3d 775, 777-78 (8th Cir.), *cert. denied*, 519 U.S. 1011, 117 S.Ct. 518, 136 L.Ed.2d 406 (1996). The motorist has suffered a delay, perhaps an irritating or even harmful delay, but "a routine traffic stop is an ordinary incident of driving." *Ford v. Wilson*, 90 F.3d 245, 248 (7th Cir. 1996), *cert. denied*, 520 U.S. 1105, 117 S.Ct. 1110, 137 L.Ed.2d 311 (1997). If the motorist then brings a § 1983 damage action, does her Fourth Amendment claim survive summary judgment and require a jury trial simply because she avers she did not

6

run the red light?  We think not.  When an officer stops a motorist for a perceived traffic violation, briefly questions the motorist about what occurred, and lets the motorist depart without issuing a citation or expanding the investigation beyond the question of a traffic violation, the officer has not unreasonably intruded upon the privacy and liberty interests protected by the Fourth Amendment.  As the Supreme Court stated in holding police officers not liable under § 1983 for negligently arresting the wrong individual, "The Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released."  *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

In this case, Crooks observed Ms. Johnson's car crossing the center line more than once on a two-lane rural highway rather early in the morning.  In his affidavit supporting the motion for summary judgment on qualified immunity grounds, Crooks explained his reasons for stopping Linda Johnson's car:

> 4. ... I then observed that the car immediately ahead of me on several occasions crossed the centerline slightly into the oncoming traffic lane.
> 5. It is and was ... my practice ... depending on the traffic and potential danger involved, not to stop a motor vehicle that drifts slightly over the centerline one or perhaps two times.  However, if the vehicle ... continues to cross the centerline more than once or twice, I pull the car over to further investigate.  One factor that I take into consideration ... is that in the early morning hours and evening hours it is possible that the driver is drowsy ... or may be suffering from some illness or may possibly be intoxicated.
> \* \* \* \* \* \*
> 7. The probable cause and my reason for stopping the car ahead of me, which I later found out to be driven by Plaintiff Ms. Linda Johnson, was to investigate the driver's condition and to issue a verbal warning, written warning, or a citation.

Crossing the center line of a two-lane highway is a violation of the statutory Nebraska Rules of the Road. *See* Neb. Rev. Stat. § 60-6,131. More significantly from the standpoint of public safety, driving while excessively fatigued or otherwise impaired is a condition that threatens motorist safety and doubtless violates Nebraska's careless driving prohibition. See Neb. Rev. Stat. § 60-6,212. Thus, it was objectively reasonable for Crooks to stop Ms. Johnson's car to determine if she was competent to continue her travels. When satisfied she was, Crooks let Ms. Johnson go with a warning rather than a citation, ending the investigatory stop. In these circumstances, we believe there was no violation of Ms. Johnson's Fourth Amendment rights as a matter of law. At a minimum, Crooks is entitled to qualified immunity from her Fourth Amendment claim because his conduct in enforcing the Nebraska Rules of the Road was objectively reasonable.

*Id.*, at 997-99.

On the Fourteenth Amendment equal protection claim, the Eighth Circuit found that the plaintiff was unable to prove a prima facie case of discrimination, stating:

The Johnsons assert a separate Fourteenth Amendment claim under 42 U.S.C. §§ 1981 and 1983, alleging that Crooks made the traffic stop on account of Ms. Johnson's race. This is a cognizable equal protection claim. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren*, 517 U.S. at 813, 116 S.Ct. 1769. This claim does not require proof that Ms. Johnson was stopped without probable cause or reasonable suspicion to believe she committed a traffic violation. But she must prove that Crooks exercised his discretion to enforce the traffic laws on account of her race, which requires proof of both discriminatory effect and discriminatory purpose. *See United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory

8

effect and purpose. *See Chavez v. Ill. State Police*, 251 F.3d 612, 634-48 (7th Cir. 2001); *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000).

Here, the Johnsons have offered no evidence that Crooks does not stop non-African Americans under similar circumstances. We will assume that a prima facie equal protection claim may also be proved by direct evidence of racial discrimination in this type of case. But the Johnsons presented no such evidence. They rely on Ms. Johnson's personal opinion that she was stopped on account of her race, plus additional aspects of the encounter that do not directly evidence racial animus–that Crooks was in a position to see Ms. Johnson's race when he pulled out into traffic, that Crooks closely followed Ms. Johnson for eleven miles before pulling her over, and that Crooks called Fort Riley the next day to bring the traffic stop to the attention of either Ms. Johnson's or Mr. Johnson's commanding officer. As the non-moving parties, the Johnsons must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). They failed to do so. As the Seventh Circuit stated in *Ford*, "We do not think ... that the combination of an arbitrary stop ... with a difference in race between the person stopped and the officer establishes a prima facie case of racial discrimination." 90 F.3d at 248-49. The district court erred in not dismissing the equal protection claim.

*Id.*, at 999-1000.

In the present case, Trooper Barton followed the Llanes's vehicle for some distance after being passed by it on the highway. He states that it was speeding and that he also observed it change lanes without signaling. Mr. Llanes, the driver of the vehicle, denies that he was speeding or that he committed any other traffic infraction; his wife agrees. There is no dispute that Mr. Llanes demanded to know the reason for the traffic stop before he would provide any identification. Trooper Barton states that he warned Mr. Llanes that he would be taken into custody if he failed to produce his drivers license and registration; that after several refusals, Trooper Barton reached

into the car and turned off the ignition, opened the car door, and ordered Mr. Llanes to exit the vehicle; that he conducted a pat-down search, which was the only physical contact he had with Mr. Llanes; and that no arrest was made because Mr. Llanes produced a drivers license, whereupon he was directed to take a seat in the front of the patrol car and, after some further discussion, was issued a warning ticket.  The plaintiffs claim that Trooper Barton suddenly, and without warning, reached into the vehicle through the open window, grabbed Mr. Llanes by the arm and hand, and tried to drag him from the vehicle while announcing that he was under arrest for speeding; Mr. Llanes claims that he was injured as a result of this physical contact.  Mr. Llanes does not dispute Trooper Barton's statement regarding what happened after he exited the vehicle (*i.e.*, that he was subjected to a pat-down search, directed to sit in the patrol car, and subsequently released with only a warning).  The plaintiffs do not claim that they were detained for an unreasonable length of time.

Trooper Barton's affidavit reads as follows:

1. I am and at all relevant times have been a Sergeant for the Nebraska State Patrol.

2. On July 4, 2004, while patrolling on US route 34, I was driving South on the Tom Osborne Expressway North of the City of Hastings, Nebraska;

3. At the time, I was traveling the posted speed limit for the road, which graduated down from 65 to 45 mph North of and at the Hastings city limits.

4. A vehicle was observed to pass the marked patrol unit and other South bound vehicles at a speed in excess of the posted limit.

5. Thereafter, I began to follow the vehicle and obtained three separate VASCAR clocks on the vehicle showing it to be traveling at approximately five miles an hour over the speed limit;

4:06-cv-03155-RGK-PRSE Doc # 65 Filed: 12/04/07 Page 11 of 22 - Page ID # 360

6. I also observed this vehicle not signaling lane changes while passing other vehicles presumably obeying the speed limit.

7. At no time during this observation did I follow so close to the observed vehicle, that it would have been considered "unsafe".

8. After stopping the vehicle, I approached the driver who was immediately agitated and uncooperative in attitude and demeanor.

9. I asked the driver for his license and registration several times and each time the drive refused to produce them unless I first told him why I stopped him. The driver was informed that if he couldn't or wouldn't provide some identification or driving credentials, he would be taken into custody.

10. I then reached into the car and shut off the ignition of the vehicle to avoid the possibility of an escalated or unsafe situation in response to his highly agitated demeanor.

11. I then opened the door and told the driver to get out of the vehicle, which the driver eventually did. Placing this subject under arrest for failure to obey a lawful order was forthcoming however after further discussion he provided a drivers license.

12. The only time that I had any physical contact with the driver was when he was patted down for a basic officer safety search after he exited his vehicle.

13. Considering the totality of the circumstances of this infraction orientated stop and after discussion with Llanes I determined it wasn't necessary to place him under arrest. He was asked to have a seat in the passenger seat of the patrol unit in an effort to diffuse the entire situation and determine what his apparent dislike, agitation, or hatred, was directed to or at and why.

14. While directing the driver back to my patrol car, the passenger, believed to be Mrs. Llanes, got out of the vehicle and

appeared to be pleading with Llanes to settle down.  She was asked to return to the vehicle with no further incident.

15. The driver, who I determined to be Mr. Llanes, the Plaintiff in this case, remained highly agitated and highly upset with me and all law enforcement in general; Mr. Llanes made statements to that effect that all law enforcement were crooked and were racist and that he was being picked on.  He also made statements about previous situations involving other law enforcement officers and/or incidents where he apparently felt he, or other members of his family were poorly treated. Several diffusing and calming efforts where attempted to appeal to some semblance of cooperation and reasonable dialog with Llanes however he would have none of it.  He was convinced he was only stopped for reasons other than the traffic infractions stated.

16. Llanes refused to calm down and no direction or advice was making any difference in his overall attitude.  Llanes was issued a warning for his driving discrepancies and released.

17. At no time did I injure either Mr. Llanes or the passenger, which I assume to be his wife, Mrs. Llanes;

18. 1 did not stop the Llanes' vehicle based on any predication other than the observed driving behaviors outlined.  Race, gender, creed, etc., didn't have anything to do with it.

19. At no time was any reference to the race of either Mr. or Mrs. Llanes, the plaintiffs in this case mentioned.

(Filing 47, exhibit 4.)

Mr. Llanes's affidavit reads, in part, as follows:

3. At all relevant times herein, I had been a resident of the City of Hastings and a Citizen of the United States of America.

4. On July 04, 2004 while traveling south in Hwy 281 towards Hastings NE and with my cruise control set on at the posted speed limit of 65 mph and after passing several cars and a marked Nebraska State Patrol (NSP) Cruiser that were traveling at lower speed.

5. The Nebraska State Cruiser followed me for approximately four to five miles, before stop me and later identified as Trooper Barton badge #38.

6. At the time on Hwy 281 north of Hastings it were a two speed limit signs and warnings to (1) reduce speed to 55 mph another (2) to reduce at 45 mph along with a stationary and flashing radar, so I disengaged the cruise control and adjust my speed accordingly.

7. While approaching the stationary and flashing radar (that actually shows the speed you are traveling) I did double check and adjust my speed to the 45 mph accordingly, and still been followed by the NSP trooper in a menacing and danger manner.

8. After the stop Trooper Barton refused to provide the reason of the stop.  Suddenly and without a warning Trooper Barton reached inside thru my window and driver side, and after grabbed me by my left arm and hand. Trooper Barton did try to dragging me out of my vehicle stating that I was under arrest for speeding, while trying in opening the door that automatically locks (when starts the engine and put in gear and can not be opening from outside unless use the keyless control or unlock from inside the vehicle).

9. At the time and prior of the assault and arresting me, I did not speed and or exceed to the posted speed limit or committed any other infractions.

10. At no time during the stop Sgt Barton warn me in any way or form, previously to the assault and my arrest, opened my door or stop and shut off my vehicle and engine.

11. After the physical assault and arrest, I was patted down, order by Sgt Barton to get inside the NSP trooper car, after I voluntarly unlock, and exited my vehicle.

12. On August 31, 2004 I'd wrote a letter and complaint addressed to Tom Nesbitt of the Nebraska State Patrol, requesting a full investigation on trooper Barton threatening and dangerous conduct towards us (my wife and myself) of that took place on July 04, 2004 Exhibit #3.

* * *

17. I sustained physical injuries and had been receiving medical assistance such as surgeries and physical therapy as result of Sgt Barton (badge #38) assault on my person on July 04, 2004.

(Filing 58, exhibit 1.)

Ms. Llanes's affidavit is substantially similar to that of her husband. It reads, in part, as follows:

3. At all relevant times herein, I had been a resident of the City of Hastings and a Citizen of the United States of America.

4. On July 04, 2004 while I was, traveling along with my husband Emilio M. Llanes, south in Hwy 281 towards Hastings NE, my husband did in fact engaged the cruise control set on at the posted speed limit of 65 mph as always has every time we go out of town.

5. After passing Lochland a Hastings subdivision my husband told me that The Nebraska State Patrol were following us for approximately few miles, before stop me and later identified as Trooper Barton badge #38.

6. My husband did in fact adjusted and set the cruise control accordingly to the speed limit signs as we were approaching Hastings.

14

At the time on Hwy 281 north of Hastings, and before the speed limit sign of 45 mph it was a stationary and flashing radar, that my husband always use to verify and adjust he's speed and sets the cruise control.

7. After the Nebraska State Patrol trooper stops us, my husband did ask Trooper Barton the reason of the stop. To what Trooper Barton did responded, "I don't have to tell you nothing" suddenly and without a warning trooper Barton reached inside thru our window and driver side, grabbing my husband left arm and hand. Trooper Barton did try to drag my husband out of our vehicle stating that he was under arrest for speeding, while trying in opening the door that was lock since it does automatically locks (when starts the engine and put in gear ). The doors cannot be opening from outside, unless use the keyless control or unlock from inside the vehicle.

8. At no time and prior of the assault and my husband arrest, my husband or we did not speed and or exceed to the posted speed limit or committed any other infractions.

9. At no time during the stop Sgt Barton, warn us in any way or form, previously to my husband arrest, neither opened our vehicle door or stop and shut off our vehicle and engine.

10. At no time during the stop Sgt Barton and I did had not any type of conversation in any way or form.

11. On August 31, 2004 my husband wrote a letter and complaint addressed to Tom Nesbitt of the Nebraska State Patrol, requesting a full investigation on Trooper Barton threatening and dangerous conduct towards us that took place on July 04, 2004.

      * * *

16. My husband sustained physical injuries and he has had been receiving medical assistance such as surgeries and physical therapy as result of Sgt Barton (badge #38) assault on my husband on July 04, 2004.

15

(Filing 58, Exhibit 2.)

Mr. Llanes's letter of August 31, 2004, which is referenced in the plaintiffs' affidavits, provides some additional details.  It reads as follows:

On July 04,2004 about 8:30 p.m. while traveling in Hwy 281 south coming from Grand Island, Nebraska to Hastings, Nebraska, I was stopped by Nebraska State Patrol Trooper Barton, Badge #38.  My cruise control was set at 65 m.p.h. approaching Lochland, a Hastings subdivision on Hwy 281. Ahead of me a NSP trooper was traveling in the same direction (going south on 281) at a speed of approximately 60 m.p.h.  Several cars were behind the NSP trooper.  None of the drivers passed the NSP unit as it was traveling south on Hwy 281.  As I was getting closer to the NSP trooper between Lochland Road and Madden Road driving on Hwy 281 South I signaled for a lane change (just across from the cemetery and golf area) I moved out to the left lane to pass the NSP trooper.  I did not accelerate my vehicle and maintained my cruise control.  I passed the NSP trooper and continued South on Hwy 281.  While proceeding South after I had passed the NSP trooper, the NSP trooper car unit came up behind me at a high speed and got close to my vehicle.  It appeared to me he was going to ram my vehicle.  The trooper was so close to my vehicle I was afraid to push the brakes to disengage the cruise control.

The NSP unit continued to follow me in a close manner to the Nebraska softball Complex.  I pushed on my brakes to disarrange the cruise control and reduce my speed and adjust to the speed limit ahead, which is 55 m.p.h.  I verified my speed by looking at the stationary radar unit located on Hwy 281 between 42nd street and 33rd street just across from the North Shore Assembly of God Church.  The radar unit showed the speed of 54 and dropping.  I knew I was within the speed limit and continuing traveling South on Hwy 281.  The trooper continued to follow me close behind.  I then approached another sign indicating the speed limit was 45 m.p.h.  I reduced my speed and engaged my cruise control to 45 m.p.h.  At North Shore and Kansas Avenue and with the NSP trooper following closely behind me I changed lanes to see and verify if in fact he was following "me".  I used my signal light to change

16

lanes. The NSP trooper did the same thing. After I passed the stoplights at Kansas and Hwy 281 just before the overpass bridge the NSP trooper turned his overhead lights on to stop me. I looked for an area to safety stop so I wouldn't interfere with the traffic on the overpass. I decided to go over the overpass and pull in the first turn or street. . . .

The NSP trooper activated his siren so I decided to stop right away. I did stop on the overpass in the southbound lane just almost across from the Senior High Gymnasium on 16th Street. I waited for the officer to approach my vehicle. He came up and asked me for my driver's license and registration. I relied asking him why did you stop me? The trooper's response was again give my your license and registration. I did ask him again "first you tell me why did you stop me?" The trooper refused to tell me why, by saying "I do not have to tell you nothing." He stated I was under arrest, reached inside my vehicle and grabbed my arm and tried to open my vehicle door in an effort to dragging me out of my vehicle by force, saying "you are under arrest for speeding, you either come peacefully or by force." I did unlock and open my door and came out of my vehicle. The NSP trooper grabbed me by the arm again. I was told by the NSP trooper to put my hands up. The trooper started to search and frisk my entire body at this time. My wife Frances came around the back of our vehicle. I told her to get inside the car and stay inside. I was worried and afraid the trooper could do something to her. I was told to get into the trooper's vehicle. I did comply since I was under arrest. While inside the patrol car the trooper started telling me about his reasons he stopped me. The trooper told me he stopped me for speeding. I disagreed and told him he did not have any reasons for stopping a me. I stated the only reason he stopped me was because I passed him and I was a Mexican. I explained to him the dangerous way he drove when he did come so close to my vehicle right after I passed him and continued to follow me all the way down through Hwy 281.

After being placed under arrest, frisked and humiliated I was given a warning ticket, NE C 429781. The trooper tried to convince me that I was speeding and I denied I was. He argued with me a great deal about my speeding. I did not speed. I believe the trooper showed a lack of respect to me, endangered my wife and I by his driving so close and

17

violated my rights as a citizen.  I do not take this lightly. The trooper's conduct towards me was threatening and dangerous.  I would like a complete investigation of this trooper's conduct so that other citizens, most certainly other minorities, do not suffer the same treatment.  I am a law-abiding citizen and did nothing wrong.

(Filing 58, exhibit 3.)

While it might be possible to distinguish the traffic stop in this case from the one in *Johnson* simply because of Trooper Barton's failure to aver that he made the stop in order to investigate the driver's condition, I do not read the *Johnson* decision as requiring such an affirmative statement of intent.   As the Court of Appeals noted in connection with its hypothetical of a motorist running a red light, "[e]ven routine traffic violations may require some investigation into the motorist's conduct or condition, followed by the exercise of judgment in deciding how to enforce the traffic laws in that situation."  326 F.3d at 998.  Because Trooper Barton's affidavit shows that he had reason to suspect that Mr. Llanes had violated at least two traffic laws, he is immune from suit with respect to his actions in stopping the vehicle and detaining the plaintiffs while he conducted an investigation.[5]  "When an officer stops a motorist for a perceived traffic violation, briefly questions the motorist about what occurred, and lets the motorist depart without issuing a citation or expanding the investigation beyond the question of a traffic violation, the officer has not unreasonably intruded upon the privacy and liberty interests protected by the Fourth Amendment."  *Id.* at 998-99.

---

[5] Trooper Barton also argues that Ms. Llanes has no Fourth Amendment claim because she was not driving the vehicle.  This is incorrect.  "A law enforcement officer's stop of an automobile results in a seizure of both the driver and the passenger, and the passenger has standing to object to an unreasonable seizure on Fourth Amendment grounds."  *Ballard v. Heineman*, No. 4:07CV3122, 2007 WL 4057662, *3 (D.Neb. Nov. 15, 2007) (citing *Brendlin v. California*, 127 S.Ct. 2400, 2407-08 (2007); *United States v. Ameling*, 328 F.3d 443, 446-47, n. 3 (8th Cir.2003)).

Trooper Barton's alleged action in grabbing Mr. Llanes and attempting to pull him from the vehicle in order to arrest him is another matter. "It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (quoting *Hannah v. City of Overland*, 795 F.2d 1385, 1389 (8th Cir.1986). "Because the qualified immunity privilege extends to a police officer who is wrong, so long as he is reasonable, the governing standard for a Fourth Amendment unlawful arrest claim 'is not probable cause in fact but arguable probable cause ... that is, whether the officer should have known that the arrest violated plaintiff's clearly established right.'" *Id.* (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir.1996)). Similarly, "[t]he right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quoting *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998)). "The violation of this right will, of course, support a § 1983 action." *Id.* (quoting *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003)). "An officer is entitled to qualified immunity when the force is 'objectively reasonable in light of the facts and circumstances confronting' the officer." *Id.* (quoting *Guite*, 147 F.3d at 750).

While Trooper Barton had arguable probable cause to arrest Mr. Llanes for failing to obey his command to produce a drivers license and vehicle registration, I cannot say as a matter of law that only a reasonable amount of force was applied in connection with the alleged arrest or attempted arrest. Accepting as true the facts stated in the plaintiffs' affidavits, including the fact that Mr. Llanes sustained physical injuries for which he has received medical treatment, Trooper Barton's qualified immunity defense fails on the Fourth Amendment excessive force claim alleged by Mr. Llanes. However, the defense is good against the Fourth Amendment unlawful arrest claim alleged by both plaintiffs, and also against the excessive force claim alleged by Ms. Llanes. (There are no facts showing that Trooper Barton arrested or attempted to arrest Ms. Llanes, or that he touched her person.)

Regarding the plaintiffs' Fourteenth Amendment equal protection claim, they have failed to provide any evidence that similarly situated individuals were not stopped or arrested by Trooper Barton.  They have also failed to provide any direct evidence of discrimination.  The plaintiffs only claim that Trooper Barton followed them closely for several miles.  Similar evidence was held insufficient to prove a prima facie case in *Johnson*, even when coupled with other evidence of harassing conduct by the officer in that case.  Thus, Trooper Barton's summary judgment motion will be granted on the equal protection claim.

The complaint alleges that there was a conspiracy to violate the plaintiffs' constitutional rights.  "In order to prevail on a section 1983 civil conspiracy claim, a plaintiff must show, 'that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff.'" *Gunter v. Morrison*, 497 F.3d 868, 873 (8th Cir. 2007) (quoting *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir.1999).  This conspiracy claim was effectively eliminated from the action when other defendants were dismissed as parties, *see* Memorandum and Order entered April 2, 2007 (filing 22),[6] but to the extent the claim remains pending against Trooper Barton, summary judgment will be granted in his favor.

The complaint also invokes the First and Ninth Amendments, but no facts are alleged to support such claims, nor is there any supporting evidence in the plaintiffs' affidavits.  Consequently, summary judgment will also be granted in favor of Trooper Barton on these constitutional claims.

---

[6] All claims against Officer Barton in his official capacity were also dismissed by this order.

20

Finally, three state-law claims are alleged against Trooper Barton:[7] (1) false arrest; (2) assault and battery; and (3) violation of Article I, § 12, of the Nebraska Constitution.[8]  These claims are beyond the scope of the pending motion, in which Trooper Barton argues for qualified immunity only on the federal claims brought under § 1983.  Accordingly, I do not consider these state-law claims at this time.

IT IS ORDERED that:

1.   Plaintiff Emilio LLanes's motion to compel discovery and request for continuance (filing 60) is denied.

2.   Defendant Vernon Barton's motion for summary judgment (filing 44) is granted in part and denied in part, as follows:

   a.   Defendant is granted immunity from suit on all claims brought by Plaintiff Frances Llanes under 28 U.S.C. § 1983;

   b.   Defendant is granted immunity from suit on all claims brought by Plaintiff Emilio Llanes under 28 U.S.C. § 1983 except on the claim that Trooper Barton violated the Fourth Amendment by using excessive force, as to which claim the motion for summary judgment is denied; and

---

[7] A fourth state-law claim was alleged only against the State of Nebraska (for negligent hiring), which has been dismissed from the action because of Eleventh Amendment immunity.

[8] The plaintiffs allege that Article I, § 12, protects against unreasonable searches and seizures, but it actually pertains only to self-incrimination and double jeopardy.  Article I, § 7, of the Nebraska Constitution applies to searches and seizures.

     c.    Summary judgment is not granted with respect to any claims arising under Nebraska law.

December 4, 2007.           BY THE COURT:

                                    s/ *Richard G. Kopf*
                                    United States District Judge